**UNITED STATES of America**

v.

**William SILVERMAN and Howard Silverman, Defendants.**

**Crim. No. 116–70.**

United States District Court,
D. New Jersey.

Dec. 18, 1975.

Jonathan L. Goldstein, U. S. Atty., by Joseph Burns, Asst. U. S. Atty., Newark, N.J., for plaintiff.

Daniel H. Greenberg, New York City, by Mark Carlin, Jerome N. Frank Clinic, Yale Law School, New Haven, Conn., pro hac vice, by special leave of court, for defendants.

## OPINION AND ORDER

COOLAHAN, Senior District Judge.

Defendants, William and Howard Silverman, move pursuant to Rule 35, Fed-

eral Rules of Criminal Procedure, or in the alternative, pursuant to 28 U.S.C. § 2255, to correct, vacate, or set aside their sentences. Both defendants were found guilty of conspiring to transport stolen securities, valued in excess of $100,000, in interstate commerce in violation of 18 U.S.C. § 371.[1] At oral argument, this Court dismissed Howard Silverman's motion because it was predicated on the false assumption that he was sentenced under 18 U.S.C. § 4208(a)(2).[2]

The transcript of the sentence hearing makes clear that on January 26, 1973 Judge Garth sentenced Howard Silverman to a term of two years' imprisonment[3] under 18 U.S.C. § 4082(a).[4] On the same day, Judge Garth sentenced Howard's father, William Silverman,[5] to three years' imprisonment under 18 U.S.C. § 4208(a)(2).[6] Therefore, this Court must now decide only William Silverman's motion.

1. Defendants were found guilty on October 27, 1972, along with others, in *United States v. Anthony Salerno, et al.*, Criminal No. 116–70. Sentences were imposed by Judge Leonard I. Garth on January 26, 1973. On November 14, 1973 Judge Garth denied defendants' motion for a new trial. Defendants then appealed their convictions to the Third Circuit Court of Appeals, which denied their appeal on September 25, 1973. On January 21, 1975 this Court denied a previous Fed.R.Crim.P. 35 motion to reduce sentence filed by William Silverman.

2. The present motion is based on the fact that a judge who sentenced under 18 U.S.C. § 4208(a)(2) intends that the Parole Board should have complete discretion in deciding when a prisoner should be released on parole. Here, defendant contends that the application of the "Guidelines for Decisionmaking," 28 C.F.R. § 2.20 (1974), to the Silvermans and the failure to have an in-person hearing at the one-third point of the sentence to determine if a decision outside the Guidelines is warranted constitute a frustration of the sentencing judge's expectations.

3. "THE COURT: . . . Nevertheless, you were found guilty by the jury and having taken into consideration all of the matters that were disclosed before me as a presiding judge at that trial I commit you to the custody of the Attorney General under Section 4082(A) and pursuant to that section for a period of two years." [Sentence Transcript (ST) p. 6, lines 15–21]

. . . . . .

"MR. LANGWAY [Assistant U.S. Attorney]: Your Honor, one point I'd like to clear up. Did you sentence the defendant [Howard] Silverman to a sentence under 4208?

THE COURT: 4082(A). That is a straight term sentence, as I recall, which is precisely what I had intended. 4082. There is a difference. I want to be very certain that you recognize that difference.

MR. LANGWAY: I understand the difference, your Honor. I wanted to make sure there was no misunderstanding as to what it was.

THE COURT: There is none in my mind. 4082(A).

MR. GREENBERG: I've just looked at the statute. There is no misunderstanding in my mind, either, your Honor." [ST 17:4–19]

4. Section 4082(a) reads:

"A person convicted of an offense against the United States shall be committed, for such term of imprisonment as the court may direct, to the custody of the Attorney General of the United States, who shall designate the place of confinement where the sentence shall be served."

5. "THE COURT: Mr. [William] Silverman, I'm going to commit you to the custody of the Attorney General for a period of three years but I'm going to do that pursuant to and under 18 U.S.C. 4208(2) [4208(a)(2)]. That is 4208(a)(2), which is a different section than which I committed your son. I am doing that very deliberately. So that you will understand, I have taken into consideration not only those matters of which I heard testimony but also matters that were revealed in the probation report. It would seem to me that that particular section of the statute which gives the utmost latitude of flexibility to a determination by the parole authorities, a determination that I cannot make at this time, but which I think might very well vest in them that discretion to determine at what point in time you should become eligible for parole.

MR. GREENBERG: I'll explain the distinction between this kind of sentence to Mr. Silverman and the sentence such as was imposed upon Howard." [ST 26:18–ST 27:14]

6. "(a) Upon entering a judgment of conviction, the court having jurisdiction to impose sentence, when in its opinion the ends of justice and best interests of the public require that the defendant be sentenced to imprisonment for a term exceeding one year, may . . ., or (2) the court may fix the maximum sentence of imprisonment to be served in which event the court may specify that the prisoner may become eligible for parole at such time as the board of parole may determine."

On July 1, 1974 William Silverman commenced service of his sentence. He was committed on July 12, 1974 to the Federal Correctional Institution at Danbury, Connecticut. According to the terms of 18 U.S.C. § 4208(a)(2), he became immediately eligible for parole. He appeared in person before hearing examiners of the United States Board of Parole on October 4, 1974, approximately three months after he commenced serving his sentence. At that hearing William Silverman was classified as a case of "Original Jurisdiction" and therefore his file was referred to the Northeast Regional Directors of the United States Board of Parole.[7]

The Regional Directors reviewed his file, but they did not give him another in-person hearing. After reviewing defendant's records, the Regional Directors decided to apply the "Guidelines for Decisionmaking," 28 C.F.R. § 2.20 (1974), which were subsequently amended, 40 Fed.Reg. 10976 (March 10, 1975), to the defendant's case. Parole was thereby denied and the defendant was to be continued to the expiration of his sentence. The Board also provided that he would be reconsidered for parole by a file review of his record at the one-third point of his sentence.

The hearing examiners decided at the one-third point file review hearing to reclassify defendant as a case of original jurisdiction. They arrived at their decision after having considered an updated "progress report" prepared by the defendant at F.C.I. Danbury and defendant's records. Since the defendant was classified as a case of original jurisdiction, his files were sent in July of 1975 to the Regional Directors, who reviewed the records and affirmed their original decision to continue William Silverman to the expiration of his sentence.

Defendant contends that when the district court sentenced him pursuant to 18 U.S.C. § 4208(a)(2), "it was laboring under a material mistake of fact regarding the parole implications of the sentence" (defendant's brief, p. 7). He argues that Judge Garth, the sentencing judge, intended that he be given serious parole consideration based on his institutional performance. Yet, because of the subsequent and unanticipated adoption of the "Guidelines for Decisionmaking," 28 C.F.R. § 2.20 (1974), *as amended*, 40 Fed. Reg. 10976 (March 10, 1975) (hereinafter Guidelines), the defendant was effectively sentenced to spend his full term in confinement. William Silverman further contends that because he did not receive the parole consideration that Judge Garth had intended he receive, his sentence was illegal and should therefore be vacated.

If defendant Silverman's sentence is not illegal within the definition of Rule 35, this Court does not have jurisdiction under that rule to entertain an applica-

---

7. 28 C.F.R. § 2.17, *as amended*, 40 Fed.Reg. 10975 (March 10, 1975), defines original jurisdiction cases in this fashion:

"A Regional Director may designate certain cases as original jurisdiction cases. The Regional Director shall then forward the case with his vote, and any additional comments he may deem germane to the National Directors for decision. Decisions shall be based upon the concurrence of three votes with the appropriate Regional Director and each National Director having one vote. Additional votes, if required, shall be cast by the other Regional Directors on a rotating basis as established by the Chairman of the Board.

(b) The following criteria will be used in designating cases as original jurisdiction cases:

(1) Prisoners who have committed serious crimes against the security of the Nation, e. g., espionage, or aggravated subversive activity.

(2) Prisoners whose offense behavior (A) involved an unusual degree of sophistication or planning or (B) was part of a large scale criminal conspiracy or a continuing criminal enterprise.

(3) Prisoners who have received national or unusual attention because of the nature of the crime, arrest, trial, or prisoner status, or because of the community status of the offender or his victim.

(4) *Long-term sentences.* Prisoners sentenced to a maximum term of forty-five years (or more) or prisoners serving life sentences."

tion to correct or vacate the sentence. Under Rule 35,[8] this Court may not consider a motion to reduce a sentence, nor may it consider a motion to correct a sentence imposed in an illegal manner unless such motion is made within 120 days of the imposition of sentence. Therefore, this Court must determine if Judge Garth's expectations about William Silverman's parole possibilities were so substantially frustrated by the use of the Guidelines as to rise to the level of illegality as that term has been employed in Rule 35 cases.

Defendant also alleges that this Court has jurisdiction under 28 U.S.C. § 2255 to entertain an application to correct or vacate his sentence. This Court has jurisdiction under 28 U.S.C. § 2255 to correct or vacate a sentence only if the "sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack . .."

William Silverman claims that when the Parole Board applied the Guidelines to his case, it denied him his statutory right to serious parole consideration. He also contends that since he was not permitted an in-person hearing before the Regional Directors of the Board, he was denied an opportunity to present effectively his institutional performance for their consideration. This deprivation, he avers, was contrary to both the legislative intent in enacting § 4208(a)(2) and the judicial intent in sentencing him under § 4208(a)(2).

■ This Court has jurisdiction to determine whether Judge Garth's expectations about defendant's parole possi-

bilities were frustrated and, if so, whether the frustration of his expectations constitutes illegality under Rule 35, or whether the defendant has suffered a deprivation of federal rights so as to confer upon this Court jurisdiction under § 2255 to correct or set aside defendant's sentence.

■ When a judge sentences a defendant, he should take into consideration the defendant's parole possibilities. The United States Supreme Court in *Morrissey v. Brewer*, 408 U.S. 471, 477, 92 S.Ct. 2593, 2598, 33 L.Ed.2d 484, 492 (1972), noted the significance of parole considerations in the sentencing process in these terms:

"During the past 60 years, the practice of releasing prisoners on parole before the end of their sentences has become an integral part of the penological system. . . . Rather than being an *ad hoc* exercise of clemency, parole is an established variation on imprisonment of convicted criminals. Its purpose is to help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed."

It is obvious that Judge Garth did consider the defendant's parole possibilities.

It is impossible to say what Judge Garth's expectations were with regard to parole when he sentenced William Silverman. We do know, however, that Judge Garth wanted to allow the Parole Board to have the greatest flexibility and discretion possible in determining petitioner's parole eligibility. He made that clear when he said:

"It would seem to me that that particular section of the statute [§ 4208(a)(2)] which gives the utmost latitude of flexibility to a determina-

---

8. Fed.R.Crim.P. 35 states:
 "The court may correct an illegal sentence at any time and may correct a sentence imposed in an illegal manner within the time provided herein for the reduction of sentence. The court may reduce a sentence within 120 days after the sentence is imposed, or within 120 days after receipt by

the court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or within 120 days after entry of any order or judgment of the Supreme Court denying review of, or having the effect of upholding, a judgment of conviction. The court may also reduce a sentence upon revocation of probation as provided by law."

tion by the parole authorities, a determination that I cannot make at this time, but which I think might very well vest in them that discretion to determine at what point in time you should become eligible for parole." [ST 27, lines 3–10]

It is true, though, that Judge Garth might have had the reasonable expectation that William Silverman would be given more favorable treatment under § 4208(a)(2) than under any other sentencing provision.

 This can be demonstrated by comparing the sentencing alternatives left open to a sentencing judge. Depending upon which sentencing statute he selects, the judge can determine when the Board of Parole may first consider the defendant for parole. If the judge sentences a defendant under 18 U.S.C. § 4202,[9] the defendant will only be eligible for release on parole after he has spent one-third of his sentence in confinement. Under 18 U.S.C. § 4208(a)(1),[10] the judge can designate the minimum term of imprisonment that the defendant must serve before he would become eligible for release. However, 18 U.S.C. § 4208(a)(2) provides that the defendant will become immediately eligible for parole. This latter section grants to the Board the widest latitude in determining when a defendant should become eligible for release on parole. *See, Grasso v. Norton (II)*, 520 F.2d 27, 28–29 (2d Cir. 1975); *Garafola v. Benson*, 505 F.2d 1212, 1213 (7th Cir. 1974). It is reasonable, therefore, to assume that a judge who sentences a defendant under § 4208(a)(2) intends that the Board of Parole be given the widest latitude to determine parole eligibility. This is exactly what Judge Garth stated he wanted to do. He never said that he wanted the defendant to be paroled early; he left that for the Board to determine.

Defendant contends, and this Court agrees, that it is also fair to assume that when Judge Garth sentenced him under § 4208(a)(2), Judge Garth anticipated that the defendant would be given meaningful consideration for parole. Defendant refers this Court to *Grasso v. Norton (II), supra,* at 33, where the Second Circuit found:

"The decision of the sentencing judge to impose an (a)(2) sentence, beside relieving a defendant from the restriction placed on eligibility for parole by Section 4202, is an expression of the court's expectations (1) that serious and meaningful parole consideration will be given to the prisoner by the Parole Board at an earlier date than the one-third point of his sentence permitted by 18 U.S.C. § 4202; and (2) that institutional performance and response to rehabilitative programs will be given due effect by the Parole Board in determining whether parole should be granted.

These expectations are in accord with the purposes of Section 4208(a)(2), as indicated by its legislative history and in the context of the statutory scheme of which it is a part. It is also in accord with the views expressed in texts and guides available to Federal Judges on the subject of sentencing, which are thoroughly discussed in *Garafola [v. Benson], supra,* 505 F.2d at 1218." [11]

The Second Circuit's finding that § 4208(a)(2) required meaningful parole consideration was based on the findings of the Seventh Circuit in *Garafola v. Benson,* 505 F.2d 1212, 1218–19 (7th Cir. 1974), where the court stated:

"Therefore, that provision [§ 4208(a) (2)], read in the context of the statutory scheme, imposes a duty on the Board

9. 18 U.S.C. § 4082(a) is also a straight sentencing provision.

10. In order to employ either § 4208(a)(1) or (a)(2), the sentence imposed must exceed one year.

11. *See,* Statements of Deputy Attorney General Lawrence E. Walch and Congressman Emanuel Celler in the Hearings on H.J. Res. 424, H.J. Res. 425 and H.R. 8923 before Subcom. No. 3, House Comm. on the Jud., 85th Cong., 2d Sess., at 8 (1958), cited in *Grasso v. Norton (II),* 520 F.2d 27, 32 (2d Cir. 1975).

to give meaningful consideration to parole prior to the time the Board would do so if the prisoner had been sentenced under § 4202."

Judge Garth, this Court is sure, knew what the Congress intended when it passed § 4208(a)(2), and he knew that judges are required to consider parole release possibilities when sentencing. When he sentenced the defendant under § 4208(a)(2), he stated that he was not in a position to determine William Silverman's parole possibilities. He therefore left that determination to the Board. As under all sentencing provisions, Judge Garth expected that the defendant would receive serious parole consideration, but unlike other sentencing statutes, he expected that the defendant would receive early parole consideration under § 4208(a)(2).

The Board, however, does give both early and meaningful consideration to prisoners under § 4208(a)(2). Usually, within three months after a defendant commences serving his sentence, he is considered for parole. He is provided with an in-person hearing at that stage. This same procedure was followed in William Silverman's case. However, defendant contends that when the Board applied the Guidelines to determine when he might be released, it failed to take into account his institutional performance. He also claims that after only three months of confinement he was not in a position to demonstrate his "exceptional" institutional adjustment

and performance [12] which would have indicated that a decision outside the Guidelines was warranted.

We shall first examine defendant's contention that the use of the Guidelines deprived the defendant of meaningful parole consideration because their use deprived him of an opportunity to demonstrate his institutional performance. The Guidelines provide the Board of Parole with a method of determining objectively and uniformly parole eligibility.[13] They are not final and fixed determinations of parole eligibility. "The guidelines are simply a statement by the Board of the manner in which it generally intends to exercise its discretion." *Battle v. Norton*, 365 F.Supp. 925, 933 (D.Conn.1973) (Appendix I, affidavit of Chairman of the Board of Parole, Maurice H. Stigler).

The Guidelines were defined in *Battle v. Norton, supra*, at 929, in this fashion: "A table has been constructed to indicate approximate ranges of time to be served for various combinations of two factors . . . . The first is severity of the offense, and the second is characteristics of the offender. Offenses have been grouped in six rows of categories from low to greatest severity. Offender characteristics have been grouped in four columns of categories from low to very high probability of favorable parole performance. At the intersections of each variable, the table sets out, in multi-

12. Defendant asserts that his institutional performance has been excellent. He states that he has committed no disciplinary infractions. He is held in minimum custody and lives in a preferred housing unit at F.C.I. Danbury. He receives meritorious good time and service awards each month. William Silverman had worked in the Danbury kitchen; he studied typing, and he volunteered for transactional analysis to gain insight into his behavior. *See* defendant's brief, p. 5.

13. 28 C.F.R. § 2.52 (1973), cited in 38 Fed.Reg. 31942 (1973), states in part:

"(a) To establish a national paroling policy, promote a more consistent exercise of discretion, and enable fairer and more equi-

table decision-making without removing individual case consideration, the United States Board of Parole has adopted guidelines for parole release consideration.

. . .

(c) It is to be stressed that these ranges are merely guidelines. Where the circumstances warrant, decisions outside the guidelines (either above or below) may be rendered. For example, cases with exceptionally good institutional program achievement may be considered for earlier release."

*See also*, 38 Fed.Reg. 31942–45 (1973); *Garafola v. Benson, supra*, at 1217; *Grasso v. Norton (II), supra*, at 32.

month ranges, different time periods of incarceration that are to serve as a guide for the decision-maker considering a prisoner with particular offense severity and offender characteristics."

The offense severity is found by comparing the crime committed with the ones listed on the table.[14] "The 'salient factor score', used to determine potential risk of parole violation, is indicated by an evaluation sheet containing some nine items, eight relating to the prisoner's background and prior criminal record, and one relating to his plans after release. *See*, 28 C.F.R. § 2.20 and *Battle v. Norton*, 365 F.Supp. 925 (D.Conn. 1973)." *Grasso v. Norton (II), supra*, at 34. The Guidelines attempt to predict the risk, or the likelihood, of a parolee committing a new crime within five years of release. *See*, Project, "Parole Release Decisionmaking & the Sentencing Process," 84 Yale L.J. 810, 822–28 (1975).

Defendant Silverman's offense behavior severity rating[15] was "very high" and his salient factor score was five, which is considered a "fair" risk prognosis. The parole prognosis for him was set at a range of between 45 and 55 months of incarceration before release

on parole. This meant that, according to the Guidelines, William Silverman would not be eligible for parole until after the expiration of his sentence. However, decisions can be made above or below the Guidelines. The Parole Board statement of policy specifically states that "especially mitigating or aggravating circumstances in a particular case may justify a decision or a severity rating different from that listed.[16] 28 C.F.R. § 2.20(d), *as amended*, 40 Fed.Reg. 10975 (March 10, 1975). Defendant contends that though decisions can be made outside the Guidelines, 92%–94% of the decisions were made within them at the time defendant was denied parole. *Grasso v. Norton (I)*, 376 F.Supp. 116, 119 (D.Conn.1974). Defendant adds that between November 1974 and February 1975 decisions outside the Guidelines constituted 14.6% of parole release decisions. *United States v. Manderville*, Crim. No. H–74–133, 396 F.Supp. 1244 (D.Conn. June 30, 1975).

 However, the use of the Guidelines is not in and of itself inconsistent with the discretion vested in the Board pursuant to 18 U.S.C. § 4203.[17] *Stroud v. Weger*, 380 F.Supp. 897 (M.D.Pa.1974). "It is well settled that the determination of eligibility for parole is wholly within

---

**14.** The footnote to the table Guidelines instructs the parole hearing officers to determine the appropriate category "by comparing the severity of the offense behavior with those of similar offenses listed." 28 C.F.R. § 2.20 (1974).

**15.** In *Battle v. Norton, supra*, the court upheld the validity of a challenge that it was impermissible for the Board to consider the severity of the offense as a basis for parole denial. *See, Wiley v. United States Board of Parole*, 380 F.Supp. 1194 (M.D.Pa.1974); *United States v. Manderville*, Crim. No. H–74–133, 396 F.Supp. 1244, 1247 n.7 (D.Conn. June 30, 1975).

**16.** The Board explained the reasons for its refusing to go outside the Guidelines in these terms:

"Your offense behavior has been rated as very high severity because you were convicted of participating in a large scale organized conspiracy involving the theft from interstate shipment of securities valued at well over $100,000. You have a salient factor score of 5 . . . .. You have been in cus-

tody a total of 12 months. Guidelines established by the Board for adult cases which consider the above factors indicate a range of 45–55 months to be served before release for cases *with good institutional program performance and adjustment.* After careful consideration of all relevant factors and information presented, it is found that a decision outside the guidelines at this consideration does not appear warranted." (Emphasis added.) Northeast Regional Directors Notice of Action, July 7, 1975.

**17.** 18 U.S.C. § 4203 reads in part:

"(a) If it appears to the Board of Parole from a report by the proper institutional officers or upon application by a prisoner eligible for release on parole, that there is a reasonable probability that such prisoner will live and remain at liberty without violating the laws, and if in the opinion of the Board such release is not incompatible with the welfare of society, the Board may in its discretion authorize the release of such prisoner on parole."

the discretion of the Parole Board." *United States v. Frederick*, 405 F.2d 129 (3d Cir. 1968); *Thompkins v. United States Board of Parole*, 427 F.2d 222, 223 (5th Cir. 1970). *See, Moody v. United States Board of Parole*, 390 F.Supp. 1403, 1405 (N.D.Ga.1974), *aff'd*, 502 F.2d 1165 (5th Cir. 1974).

28 C.F.R. § 2.18, *as amended*, 40 Fed. Reg. 10975 (March 10, 1975), states:

"The granting of parole rests in the discretion of the Board of Parole. The Board may parole a prisoner who is otherwise eligible if (a) in the opinion of the Board such release is not incompatible with the welfare of society; (b) he has observed substantially the rules of the institution in which he is confined; and (c) there is a reasonable probability that he will live and remain at liberty without violating the laws (18 U.S.C. 4203(a))."

The Board will consider other factors which include "changes in motivation and behavior," "changes in attitude toward self and others," "personal goals and description of personal strength or resources available to maintain motivation for law abiding behavior," and such institutional experiences as these (28 C.F.R. § 2.19(d)(f)–(j), *as amended*, 40 Fed.Reg. 10975 (March 10, 1975):

"(f) Institutional experience:
(1) Program goals and accomplishments;
(i) Academic;
(ii) Vocational education, training or work assignments;
(iii) Therapy.
(2) General adjustment;
(i) Inter-personal relationships with staff and inmates;
(ii) Behavior, including misconduct.
(g) Community resources, including release plans:

(1) Residence; live alone, with family or others;
(2) Employment, training, or academic education;
(3) Special needs and resources to meet them.
(h) Results of scientific data and tools;
(1) Psychological tests and evaluations;
(2) Statistical parole experience tables (salient factor score).
(i) Paroling policy guidelines as set forth in § 2.20;
(j) Comments by hearing examiners, evaluative comments supporting a decision, including impressions gained from the hearing."

These are only some of the many such criteria used besides the Guidelines to determine parole eligibility.

Besides, these "time ranges specified by the Guidelines are established *specifically* for the cases with *good institutional adjustment and program progress*" (emphasis added). 28 C.F.R. § 2.20(b), *as amended*, 40 Fed.Reg. 10975 (March 10, 1975). Therefore, it is assumed that with good institutional adjustment these factors used to determine the parole prognosis will determine when a prisoner should be released.[18] Institutional performance is built into the system. This may explain the high percentage of implementation of the Guidelines. If a prisoner's institutional performance is bad, he can be given a higher salient factor score, or a decision beyond that specified in the Guidelines is possible. It is not the frequency of decisions outside the Guidelines which is dispositive, only that such decisions can and are made.

Defendant does not contend, however, that the application of the Guidelines to his case per se warrants the correction of

---

18. "The guideline ranges are set for cases with good institutional performance. A hearing panel may render a decision either above or below the guideline range if it is justified by a sufficient explanation. Circumstances in which the Board may consider decisions below the guidelines include exceptionally good institutional perform-

ance; . . . and cases in which the Board feels that the clinical risk prognosis is substantially better than indicated by the offender characteristics score."

*Battle v. Norton, supra*, at 932–33; *Garafola v. Benson, supra*, at 1214 (citing *Battle v. Norton* with approval).

his sentence, but rather, he urges this Court to accept the proposition that these Guidelines so materially frustrated Judge Garth's plans for defendant's parole as to be illegal. In October of 1972 the Board effectuated the Guidelines, which defendant contends constituted a major change in the parole criteria away from rehabilitation as the criteria in § 4208(a)(2) cases. *Battle v. Norton, supra*, at 929–30 n.4. It was not until November 19, 1973, nearly 11 months after defendant was sentenced, that these Guidelines were implemented, so Judge Garth could not have considered their effect on defendant's parole chances.

■ This Court cannot accept that assertion. Since the Guidelines themselves assume good institutional adjustment, and since decisions can be made outside the Guidelines if institutional performance suggests that a decision outside the Guidelines is warranted, the use of the Guidelines is perfectly consistent with an expectation of meaningful parole consideration. Therefore, Judge Garth's expectations could not have been frustrated by the subsequent adoption of the Guidelines. If we accept defendant's argument that subsequent changes in parole procedures which are not in themselves inconsistent with the parole policy of the statute and not inconsistent with what the Judge had in mind when he left the question of parole in the discretion of the Board, then we would be opening the door to resentencing every time a new procedure is adopted. This would discourage the Board from implementing innovative procedures and would encourage only sterility in parole policy-making.

In fact, this issue was addressed by this Circuit in *Stroud v. Weger, supra*, at 899, where the court found that § 4208(a)(2)

" . . . does not affect the Board's discretion in determining whether parole should be granted. . . . *Nor does a sentence under 18 U.S.C.A. § 4208(a)(2) require the Parole Board to release an inmate upon suitable institutional adjustment.* Section 4208(a)(2) merely eliminates the requirement of 18 U.S.C.A. § 4202 that a prisoner serve one-third of his sentence before becoming eligible for parole consideration." (Emphasis added.)

There is nothing in any of the legislative history presented to this Court by the defendant to demonstrate that the findings of the court in *Stroud v. Weger* were incorrect in this regard.

Defendant relies heavily on a line of cases where § 4208(a)(2) prisoners were not given an opportunity to demonstrate their good institutional performance at a hearing at the one-third point of their sentences. At the initial hearing [19] given at the end of the first three months of incarceration, prisoners are not ordinarily given serious parole consideration, the court found in *Garafola v. Benson, supra*, at 1215. This inability to demonstrate effectively institutional adjustment and rehabilitation, because the three-month point is too early, was found inconsistent with the legislative intent in adopting § 4208(a)(2) and the judicial intent in sentencing under § 4208(a)(2).

In *United States v. Slutsky*, 514 F.2d 1222, 1228 (2d Cir. 1975), the court found:

" . . . the Board of Parole's own procedures (no one-third point hearing), coupled with its use of the guidelines, nearly assure that the parole consideration afforded the appellants will differ significantly from what we believe the sentencing court must have expected."

In *Slutsky*, two § 4208(a)(2) prisoners were only given a hearing after three months of confinement, after which they were continued until the expiration of

---

**19.** The initial hearing normally consists of a 15- to 20-minute interview where the prisoner speaks directly to the hearing examiners responding to their questions. Usually the prisoner's case worker is on hand as well. *Grasso v. Norton (II)*, 376 F.Supp. 116, 118 (D.Conn. 1974), *rev'd in part, Grasso v. Norton (II), supra.*

their terms. They were never reconsidered for parole. This the Second Circuit found inconsistent with the statutory requirement of meaningful parole consideration and, therefore, inconsistent with the sentencing judge's expectations. *United States v. Slutsky, supra,* at 1229.

The Court in *Slutsky* did not find that the use of the Guidelines alone mandated a correction of sentence in § 4208(a)(2) cases, but that the use of the Guidelines coupled with an inability to demonstrate to the Board institutional performance at a point when such performance could be indicative of rehabilitation was inconsistent with what a judge would expect when sentencing a defendant under § 4208(a)(2) and, therefore, did mandate a resentencing where the motion was *timely* made. The court reasoned that § 4208(a)(2) prisoners should be given as much of an opportunity to demonstrate readiness for parole as § 4202 prisoners who receive an in-person hearing at the one-third point of their sentences. The court in *Slutsky* left open the question whether the hearing had to be an in-person hearing. Subsequent to *Slutsky,* the Second Circuit decided *Grasso v. Norton (II), supra,* the leading case in this area.

In *Grasso (II)* the court determined the issue left open in *Slutsky,* the nature of the hearing that a § 4208(a)(2) prisoner is entitled to at the one-third point of his sentence. The *Grasso* court noted that courts had gone three ways on the question of a right to a hearing at the one-third point of a § 4208(a)(2) prisoner's sentence. In *Moody v. United States Board of Parole,* 390 F.Supp. 1403 (N.D.Ga.1974), *aff'd without opinion,* 502 F.2d 1165 (5th Cir. 1974), the Fifth Circuit held that the Parole Board had the discretion not to review a 4208(a)(2) prisoner's denial of parole after the initial hearing. The Seventh Circuit, in *Garafola v. Benson,* 505 F.2d 1212 (7th Cir. 1964), held that an in-person hearing at

the one-third point of a § 4208(a)(2) prisoner's sentence was mandatory. However, in the Third Circuit, *Stroud v. Weger,* 380 F.Supp. 897 (M.D.Pa.1974), held that a file review would be sufficient at the one-third point of the sentence. *Grasso (II),* relying on *Stroud v. Weger,* adopted the standard that a file review was all that was mandated by § 4208(a)(2). The court reasoned that an in-person interview would be of little benefit when utilizing the current institutional progress report and the prison file.

In *Grasso v. Norton (II), supra,* at 36, the court noted:

"The initial hearing given the (a)(2) prisoner is a full-scale institutional hearing at which the prisoner appears. At that hearing the panel of examiners can question the prisoner, listen to his statements and make an evaluation of his characteristics based on personal contact. The panel has before it information as to the prisoner's prior criminal experience, social background, capabilities, physical and mental health, and other pertinent factors. On the basis of this information, the panel determines what guidelines apply and what effect is to be given to them in the particular case.

What is lacking at that hearing is information as to the prisoner's institutional progress and program achievement which might indicate departure from the guidelines. Of course, such information does not exist at that point. But we see no reason why this factor cannot be adequately evaluated at the one-third point of the (a)(2) prisoner's sentence in the review on the record provided by 28 C.F.R. § 2.14(b)."

The court in *Grasso (II)* noted that at a non-in-person file review hearing, the Board will have before it the record of the initial hearing and the basis for its first decision.[20] It will have the current

---

**20.** William Silverman's case, however, is slightly different from *Grasso.* Defendant Silverman was classified as a case of original jurisdiction, so that the hearing examiners before whom he appeared at the initial hearing did not make the final determination of his parole eligibility. The hearing examiners decided only to classify him as a case of original

institutional progress report which supplies the factors lacking in the initial hearing. Besides, in the case *sub judice*, the defendant admits that the Board also had a progress report which he made himself (defendant's brief, p. 4). Given these factors, the local board, it seems, would be able at such a hearing adequately to determine whether the prisoner had "exceptionally good institutional program achievement" or whether other circumstances would warrant a decision outside the Guidelines for an earlier release under 28 C.F.R. § 2.20(c). *Grasso v. Norton (II), supra,* at 36–37.

The court in *Grasso v. Norton (II), supra,* at 36–37, concluded:

"We fail to see how the appearance of the prisoner in person at that point would be of any material aid to the panel of examiners in reaching an informed decision.

As we view it, the combination of the initial institutional hearing and the file review on the record at the one-third point of the sentence provided by revised 28 C.F.R. § 2.14(b) gives the (a)(2) prisoner as effective and meaningful parole consideration as is afforded the non-(a)(2) prisoner by the institutional hearing given when one-third of his sentence has expired. This is all that 18 U.S.C. § 4208(a)(2) requires."

In *Stroud v. Weger, supra,* at 900, the court held "that a prisoner with a sentence under 18 U.S.C.A. § 4208(a)(2) who receives a continuance to a date past one-third of his maximum sentence at an initial hearing is entitled to receive a review by an examiner panel on the record, including a *current* institutional progress report." The court concluded "that an (a)(2) prisoner cannot be given less effective parole consideration than a non-(a)(2) prisoner, nevertheless, . . . [that does not mean] that at the one-third point the (a)(2) prisoner, who has already had an initial in-person parole hearing, is entitled to another in-person hearing." *Stroud v. Weger,* at 901.

This file review standard comports, *Grasso (II)* found, with the authority vested in the Board. Nor does this Court feel that Judge Feinberg's dissent in this regard (in *Grasso (II)*) should persuade it otherwise. The clear issue here is whether the sentencing judge's expectations about meaningful parole consideration were frustrated. If the file review at the one-third point does indeed give the prisoner an opportunity for consideration outside the Guidelines taking institutional performance into account, then the expectations of a judge who desired only that the Board be vested with full discretion on the issue of meaningful parole consideration is certainly fulfilled.

■ At oral argument defendant noted that as of September 5, 1975, 28

---

jurisdiction. They sent his files and their own report to the Regional Directors who then made the ultimate decision to apply the Guidelines. The Regional Directors also decided to give the Silverman case a file review at the one-third point in the sentence. It seems inconsequential to this Court that when a decision is made after a file review, the decision is made by the Regional Board as opposed to the local one. The Regional Board had before it all of the files as well as the up-dated progress report prepared by the defendant. It had the benefit of the hearing examiners' original report on the initial hearing as well. If the hearing examiners had found that the defendant's case warranted parole release at the time of the initial hearing, they would not have classified the defendant as a case of original jurisdiction, thereby deferring the final decision to

the Regional Directors. Likewise, at the one-third point in the defendant's sentence, if the hearing examiners felt that William Silverman's institutional performance warranted consideration outside the Guidelines, they could have done so. All that the *United States v. Slutsky, Grasso v. Norton (II), Stroud v. Weger* line of cases requires is for the hearing examiners to give a file review at the one-third point of the sentence. Those cases do not require release. Just because the hearing examiners decided not to release William Silverman, but rather decided to reclassify him as a case of original jurisdiction, thereby requiring the Regional Directors to decide whether to apply the Guidelines, is not cause for a different result from that called for in the *Stroud v. Weger* line of cases.

C.F.R. § 2.14(b)[21] had been amended so as to require that § 4208(a)(2) prisoners who complete one-third of their maximum sentences after August 1, 1975 would receive in-person hearings. *See,* 40 Fed.Reg. 41328 (Sept. 5, 1975). The Board's new regulations state specifically that "while the Board does not believe that constitutional due process or the statutes concerned require this result . . ., it was concluded that the better course would be to modify this rule as adopted." This Court admits that perhaps it is the better rule of law to require in-person hearings, though we note that absent a showing of a due process deprivation[22] the failure to give an in-person hearing, rather than a file review, would not so undermine the process of giving meaningful parole consideration as to constitute a frustration of Judge Garth's expectations and in turn mandate resentencing.[23]

Defendant also relies on the unreported case from the District of Connecticut,

*United States v. Manderville, supra.* There the judge had determined that because of the relatively minor role played in the robbery by the defendant and his lack of prior knowledge or participation in the plan of the robbery, he should have received early parole consideration. The prisoner in *Manderville* had been the driver of a get-away car in a small robbery. He was unaware of the robbery until after it occurred. He had merely driven the car to the scene of the robbery, although after the robbery took place, he asked for part of the proceeds. The judge found that the Parole Board's finding that the defendant's severity rating was "high" under the Guidelines was inconsistent with what he had specifically in mind at the time of sentencing. The sentencing judge found on a *timely* motion to reduce sentence under Rule 35 that the Board may have assigned the prisoner that rating based on the original crime charged and not on that which the defendant had been convicted. *United States v. Manderville, supra,* 396

**21.** 28 C.F.R. § 2.14(b) reads in part:

". . . a prisoner sentenced to a maximum term of more than 18 months under 18 U.S.C. 4208(a)(2) who receives a continuance to a date past one-third of his maximum sentence at an initial hearing shall upon completion of one-third of his sentence receive a review by an examiner panel on the record (including a current institutional progress report)."

**22.** The parties have not argued that due process of law under the Fifth Amendment to the United States Constitution requires that an in-person rather than a file review hearing be made at the one-third point in a § 4208(a)(2) prisoner's sentence. The United States Supreme Court noted in *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), that a due process deprivation depends on "whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment. *Fuentes v. Shevin,* 407 U.S. 67 [92 S.Ct. 1983, 32 L.Ed.2d 556] (1972). Once it is determined that due process applies, the question remains what process is due. It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands." Here it would seem that due process does not go so far as to require an in-person as opposed

to file review hearing. *See Grasso v. Norton (II), supra.*

**23.** Defendant does not allege that the Board's new rule should be applied retroactively. In *Grasso v. Norton (II),* 376 F.Supp. 116 (D.Conn.1974), *rev'd in part, Grasso v. Norton (II),* 520 F.2d 27 (2d Cir. 1975), the court discussed the problem of retroactivity in this area claiming that the *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), *Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), standard of the "effect on the administration of justice" should not be applied. The court in *Grasso (II)* claimed that the standard should be: to avoid "substantial inequitable results," *Cipriano v. City of Houma,* 395 U.S. 701, 706, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), or the standard should be: whether the defendant suffered "serious loss," *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), quoted in *Goldberg v. Kelly,* 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and *Scarpa v. United States Board of Parole,* 477 F.2d 278 (5th Cir. 1973), decision vacated on reconsideration of grounds of mootness, 414 U.S. 809, 94 S.Ct. 79, 38 L.Ed.2d 44 (1973). This Court feels that the defendant has failed to demonstrate sufficient deprivation under any of the above tests to warrant retroactive application of the new rule to his case.

F.Supp. 1244. In *Manderville,* the judge was basically entertaining a motion to reduce sentence under Rule 35, which he could do as that motion has been viewed as merely a plea for leniency.

Defendant Silverman was not found to have been an unwitting participant in a robbery, but a fully knowing participant in the interstate transportation of securities in excess of $100,000. The defendant was a member of a well organized conspiracy whose purpose was to commit a sophisticated crime. The judge had not decided that special consideration was due to William Silverman, but rather left the matter entirely in the Parole Board's hands. Nor is the application *sub judice* one to reduce sentence imploring this Court for leniency. A motion to reduce sentence would be untimely and therefore under Fed.R.Crim.P. 35, this Court would be without jurisdiction to entertain it. *Manderville,* then, is totally inapposite.

Defendant's reliance on such cases as *United States v. Slutsky, supra,* at 1229, is misplaced because those cases were not correction-of-sentence cases. They were motion-to-reduce cases timely made within the 120-day rule imposed by Rule 35. The court in *Slutsky* noted that where there was a mistake so easily rectified by resentencing, the court should do so in the interest of justice. However, the case *sub judice* calls for a correction or vacation of sentence under Rule 35. This Court is without jurisdiction to make a correction of sentence at any time unless the sentence was illegal. If a judge sentences a defendant based on a material mistake of fact about the defendant's offense which would influence adversely and incorrectly his sentence, then the sentence may be corrected. *United States v. Malcolm,* 432 F.2d 809, 816 (2d Cir. 1970) (where the sentencing judge was mistaken about the defendant's record). In *United States ex rel. Brown v. Rundle,* 417 F.2d 282, 284–85 (3d Cir. 1969), the court found that the defendant's sentence should be corrected where the sentencing judge relied on a confession not in evidence and an unverified prejudicial statement supposedly made by the defendant. Similarly, in *United States v. Bowser,* 497 F.2d 1017 (4th Cir. 1974), *cert. denied,* 419 U.S. 857, 95 S.Ct. 105, 42 L.Ed.2d 91 (1974), the court found that the defendant's sentence should be corrected because of the possibility of misunderstanding of the defendant's role in the crime by a judge who had not tried the case but who sentenced the defendant to a greater sentence than he had sentenced a more culpable and violent second offender. *See also, Bryd v. Prescor,* 163 F.2d 775 (8th Cir. 1947), *cert. denied,* 333 U.S. 846, 68 S.Ct. 648, 92 L.Ed. 1129 (1947); *United States v. Espinoza,* 481 F.2d 553 (5th Cir. 1973) (an erroneous bad record was enough to warrant the correction of sentence); *McGee v. United States,* 462 F.2d 243 (2d Cir. 1972) (correction of sentence warranted where the sentencing judge relied on evidence of prior convictions illegally obtained); *Tucker v. United States,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) (assumptions about record materially untrue warranted correction of sentence); *Battaglia v. United States,* 478 F.2d 854 (5th Cir. 1972) (misinformation in the presentence report warranted a correction of sentence).

The standard to be applied to determine if the material misrepresentation of fact constituted illegality under Rule 35 is:

> ". . . whether the sentencing process conformed with 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions,' . . . whether it was infected with fundamental defects resulting in a miscarriage of justice, and whether it was consistent with rudimentary demands of fair procedures."

The court went on to add:

> "Misinformation or misunderstanding that is materially untrue regarding a prior criminal record, or material false assumptions as to any facts relevant to sentencing, renders the entire sentenc-

ing procedure invalid as a violation of due process."

*United States v. Malcolm, supra,* at 816.

 The court addressed this very issue in *Slutsky, supra,* at 1229, although it did not decide it. The court there stated that a "mistaken assumption about the effect of a section 4208(a)(2) sentence perhaps does not rise to the level of a sentencing judge's mistaken impression of a defendant's prior criminal record." Certainly it would seem arguable that it would not,[24] but we do not have to reach that issue as here we have found that Judge Garth was not mistaken in his assumption nor were his expectations frustrated with regard to the defendant's parole possibilities under § 4208(a)(2).[25] Since we have found no failure by the Board to comply with Judge Garth's expectations, there has been no material mistake of fact and no illegality in sentencing. Therefore, even if the court has "continuing authority" and jurisdiction under § 2255 to correct a sentence when the court's intentions are not complied with by the Parole Board, *Kortness v. United States,* 514 F.2d 167 (8th Cir. 1975); *United States v. Lewis,* 392 F.2d 440 (4th Cir. 1968); *contra, O'Neill v. United States,* 315 F.Supp. 1352 (D.Minn.1970), *aff'd,* 438 F.2d 1236 (8th Cir. 1971), since there has been no failure to comply with Judge Garth's expectations, there are no grounds for reduction of sentence.

Accordingly, it is on this 18th day of December, 1975 ordered that this motion for a correction of sentence, or in the alternative, for relief under § 2255, is denied.

**24.** The court in *Kortness v. United States,* 514 F.2d 167, 168 n. 1 (8th Cir. 1975), held, "Fed.R. Crim.P. 35, of course, cannot be used to extend judicial authority over a sentence beyond the 120-day period. *United States v. Regan,* 503 F.2d 234, 237 (8th Cir. 1974); *see Hill v. United States,* 368 U.S. 424, 430, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962); *United States v. Mehrtens,* 494 F.2d 1172 (5th Cir. 1974); *United States v. Ellenbogen,* 390 F.2d 537 (2d Cir.)

[1968], *cert. denied,* 393 U.S. 918, 89 S.Ct. 241, 21 L.Ed.2d 206 (1968)."

**25.** This Court believes that if Judge Garth knew at the time of sentencing exactly what procedures the Board would apply to decide William Silverman's parole eligibility, he would not have changed his mind about the sentence he imposed on the defendant.